Argued and submitted March 6, 2000, judgments of conviction for aggravated murder reversed in part, affirmed in part and case remanded to circuit court for further proceedings December 29, 2000

## STATE OF OREGON,
*Respondent,*

*v.*

## ERNEST NOLAND LOTCHES,
*Appellant.*

## (CC 92-08-34431; SC S40460)

17 P3d 1045

Jeff Price, Los Angeles, argued the cause and filed the brief for appellant.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With him on the brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, Douglas F. Zier, Assistant Attorney General, and Lainie Block, Assistant Attorney General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Leeson, and Riggs, Justices.*

GILLETTE, J.

---

* Kulongoski, J., did not participate in the consideration or decision of this case.

## GILLETTE, J.

This criminal case is before us on automatic and direct review from convictions for aggravated murder and a sentence of death. *Former* ORS 163.150(1)(g) (1997), *repealed by* Or Laws 1999, ch 1055, § 1.[1] Following a jury trial, the trial court entered a judgment finding defendant guilty of three counts of aggravated murder, one count of attempted aggravated murder, one count of attempted murder, one count of assault in the first degree with a firearm, one count of robbery in the first degree, and one count of felon in possession of a firearm, and imposed a sentence of death. For the reasons that follow, we reverse two of the three convictions for aggravated murder and remand those charges to the trial court for further proceedings. We affirm the other convictions and the sentence of death.

## I. SUMMARY OF FACTS

■ Because the jury found defendant guilty of all the crimes charged, we view the evidence presented at trial in the light most favorable to the state. *See State v. Thompson*, 328 Or 248, 250, 971 P2d 879, *cert den* 527 US 1042 (1999) (stating principle).

At about 2:30 in the afternoon on August 22, 1992, defendant approached Hedges in O'Bryant Square near downtown Portland. While bantering back and forth with Hedges, defendant pretended to be a police officer and frisked Hedges. While Hedges was bending over, defendant slapped Hedges on the back of the motorcycle helmet that Hedges was wearing. The slap was unprovoked. Hedges stood up and asked defendant what he was doing. Defendant then began shouting obscenities at Hedges. Hedges made an effort to calm defendant; defendant joined a friend sitting on a nearby retaining wall. Hedges kept an eye on defendant and, when defendant and his friend walked away, Hedges followed him. After a few blocks, Hedges saw a Portland Guide,[2] Cramer,

---

[1] Judgments of conviction and sentences of death now are subject to automatic review in this court under ORS 138.012(1). In enacting ORS 138.012(1), the legislature renumbered the statute that described the court's reviewing authority in death-penalty cases, but made no substantive change to that authority. That statutory change does not affect the analysis or disposition of this case.

[2] The Portland Guides is an unarmed unit of the Economic Improvement District (EID), a program funded by a confederation of Portland merchants to provide

and told Cramer that he wanted to file a complaint against defendant.

Cramer radioed to the Portland Guides headquarters and to other nearby guides that a man had been assaulted by an individual who was then near Pioneer Square. Cramer described defendant and asked for an officer to respond. Two other unarmed Portland Guides, Edwards and Calderon, spotted defendant walking down the street and began to follow him at a distance of about half a block. They signaled to Riley, another unarmed Portland Guide who happened to be nearby, and Riley, too, began to follow defendant. Defendant appeared to notice that he was being followed and increased his pace.

William Hall, an armed EID officer, approached defendant from the direction in which defendant was walking. Riley also converged on defendant. Hall called out to defendant, stating that he would like to have a word with him. Defendant then threw his hand up toward Riley in an apparent effort to strike him. Riley blocked defendant's swing. Defendant ran north toward Alder Street. Hall, Riley, Edwards, and Calderon began running in pursuit.

There is some dispute about precisely what happened next but, by all accounts, defendant slowed down and Hall began yelling, "He's got a gun. Get down." Shots were fired. Most of the witnesses to the episode could not say who shot first or even where Hall was when the first shot was fired. Riley testified that he saw defendant pull a gun out of a paper bag and that no shots had been fired before that moment. A bystander, Gates, testified that she heard a shot and then saw defendant pull a gun out of the back of his pants.

In any event, during that incident, defendant raised his gun, aimed it directly at Edwards, and shot at her. Bullets hit her in the left breast and in the right arm, fracturing a bone and requiring surgery and the insertion of a metal plate. Riley dragged the wounded Edwards into a nearby shop and

---

security and information to visitors to the city. Portland Guides carry radios and wear distinctive green caps, blue slacks, and white shirts. EID has its own officers, who wear blue caps, blue slacks, and blue shirts. EID officers carry weapons.

ran for cover in the back of the store. Hall engaged defendant in an exchange of gunfire; two bullets fired from Hall's gun later were recovered from inside the shop.

Defendant fled down Fourth Avenue with Hall in pursuit. Defendant ran up to a car stopped at a traffic light in which Keaton and her 9-year-old grandson were riding. Defendant came up from behind Keaton, pointed a gun at her head through the half-open window, and said something to the effect that "You are going to take me somewhere." Keaton responded, "No way," and stepped on the accelerator. The car stalled and Keaton immediately began trying to unfasten her grandson's seatbelt and shove him out the car door. While Keaton was fumbling with the seatbelts, she looked up and saw Hall standing in front of a pillar along the street on the opposite side of her car, yelling at defendant, directing him to get away from the car and "leave the innocent alone." According-ing to Keaton, defendant then ceased his efforts to get into her car and directed his attention to Hall. Meanwhile, the grandson unlocked the car door, got out, and ran toward where Hall had been standing. Keaton took the keys out of the ignition and threw them down a sewer grate, and then closed her eyes and waited.

Defendant began shooting in Hall's direction. Hall left the relative cover provided by the pillar and pulled Keaton's grandson to safety. He also shot out two of the tires on Keaton's car and pushed two transients out of the line of fire. In the skirmish, defendant shot Hall twice. One shot entered and exited Hall's wrist. The other, fatal, shot entered Hall's arm, traversed his lungs, and penetrated his heart.

Defendant, himself uninjured, then fled down Stark Street, hiding his gun behind his back. He approached a pickup truck stopped at a traffic light on Washington Street. Reaching through the window of the truck, he pointed his gun at the driver's head and ordered the occupants out of the vehicle. They immediately complied. Defendant then drove off, heading the wrong direction down Third Avenue, a one-way street. He sped down that street, swerving to avoid oncoming cars. He then drove over the Burnside Bridge and turned onto Martin Luther King Boulevard. Defendant next attempted to turn onto Southeast Ankeny, but he was driving

too fast and was unable to negotiate the turn. The truck jumped the curb, hit a parked car and, ultimately, came to a stop after crashing into some other parked cars in an adjacent used-car lot.

A customer at the car lot who saw the crash went to aid defendant. He forced open the driver's-side door of the truck and asked defendant if he was hurt. Defendant answered no and made an effort to get out of the truck from the passenger side. The customer asked defendant if he was going to run, and defendant replied, "Hell, yes, I got to get out of here." The customer stepped aside, and defendant slid back to the driver's side to get out. By that time, several marked police cars had arrived at the scene. One of them, driven by Officer Elliot, pulled up in the vicinity of the truck after having been flagged down by an individual in front of the car lot. After Elliot had stopped his car, defendant reached back into the truck and pulled out his gun. Defendant turned and aimed the gun in Elliot's direction and began walking toward him. Defendant then stopped, assumed a combat stance in which he squared off and held the gun in front of him with two hands. When Elliot realized what was happening, he leaned away from defendant and put his car in reverse. Defendant fired at Elliot as he was backing up. Defendant then aimed and fired a second shot at Elliott that narrowly missed him and struck the driver's seat of the police car.

After shooting at Elliot, defendant began running toward the corner of Ankeny and Grand Avenue. He attempted unsuccessfully to commandeer one vehicle, and then succeeded in getting into a second one, which someone apparently had abandoned in the middle of the street. While defendant tried to start that car, Elliot, now armed with a shotgun, approached defendant and ordered him to drop his gun. Defendant again briefly appeared to consider fleeing. However, by this time, he was surrounded by other officers. He threw down his gun and surrendered.

After he was taken into custody, defendant agreed to give blood and urine samples. Experts later extrapolated

from those samples that defendant probably had a blood-alcohol content of approximately .17 percent at the time of the crimes.

## II. THE TRIAL

Defendant was charged in a ten-count indictment for his conduct in connection with the foregoing events. The first three counts, discussed below, charged defendant with aggravated murder, for intentionally killing Hall: (1) during the course of and in the furtherance of and in immediate flight from an attempted robbery; (2) in the course of and in the furtherance of and in immediate flight from an attempted second-degree kidnaping; and (3) in an effort to conceal his identity as the perpetrator of an attempted murder. The other seven charges concerned defendant's conduct with respect to Elliot, Edwards, Riley, and the driver of the truck.[3] Defendant pled not guilty to all charges.[4] After a jury trial, he was acquitted of one count of attempted murder and convicted on all the other counts. After a penalty-phase proceeding, defendant was sentenced to death.[5]

Defendant requests that this court grant him a new trial and assigns 20 claims of error, all relating to the guilt phase of his trial. We have considered each of defendant's assignments of error. Several of those assignments were not preserved for review or otherwise are not well taken. Other assignments of error present questions that do not warrant

---

[3] A fourth count charged defendant with attempted aggravated murder for his actions with respect to Elliot, a police officer. A fifth count charged defendant with the attempted murder of Edwards. A sixth count charged first-degree assault with a firearm based on defendant's shooting of Edwards. A seventh count charged defendant with the attempted murder of Riley. An eighth count charged defendant with first-degree robbery for taking the pickup truck at gunpoint. A ninth count, also for first-degree robbery of a vehicle, was dismissed before trial. Finally, a tenth count charged defendant with being a felon in possession of a firearm.

[4] In his opening statement, defense counsel acknowledged to the jury that the evidence would show that defendant had killed Hall and shot Edwards, but asserted that the evidence also would show that, during the entire episode, defendant was attempting to get away from Hall who, in a panic, initiated the gunplay and began to chase defendant, shooting wildly. Defense counsel also suggested that the evidence would show that defendant was intoxicated and suffered from a mental disease or defect at the time of the crimes.

[5] Defendant was sentenced to death on the three counts of aggravated murder. He was sentenced to consecutive prison sentences totaling 198 months for the convictions on the other counts.

discussion in this opinion because they have been resolved in other decisions by this court. We address the remaining issues in the order in which the events giving rise to the assignments occurred during the proceedings below. As we shall explain, we also address a matter that was not raised by defendant, but that arguably constitutes an error apparent on the face of the record.

## III. SUFFICIENCY OF THE INDICTMENT

Defendant argues that the first three counts of the indictment, for aggravated murder, are impermissibly vague. Defendant did not demur to those charges, but argues nonetheless that the trial court should have stricken them on its own motion. Those counts state:

### "Count 1

### "AGGRAVATED MURDER

"The said defendant, on or about August 22, 1992, in the County of Multnomah, State of Oregon, did unlawfully and intentionally attempt to commit the crime of Robbery in the First Degree and in the course of and in the furtherance of and in the immediate flight from said crime which the said defendant was attempting to commit, the said defendant personally and intentionally did cause the death of another human being, to-wit: William Hall, a person who was not a participant in the crime, contrary to the Statutes in such cases made and provided and against the peace and dignity of the State of Oregon,

### "Count 2

### "AGGRAVATED MURDER

"The said defendant, on or about August 22, 1992, in the County of Multnomah, State of Oregon, did unlawfully and intentionally attempt to commit the crime of Kidnaping in the Second Degree and in the course of and in the furtherance of and in the immediate flight from said crime which the said defendant was attempting to commit, the said defendant personally and intentionally did cause the death of another human being, to-wit: William Hall, a person who was not a participant in the crime, contrary to the Statutes in such cases made and provided and against the peace and dignity of the State of Oregon,

*"Count 3*
"AGGRAVATED MURDER

"The said defendant, on or about August 22, 1992, in the County of Multnomah, State of Oregon, did unlawfully and intentionally, in an effort to conceal the identity of the perpetrator of the crime of Attempted Murder, cause the death of another human being, to-wit: William Hall, contrary to the Statutes in such cases made and provided and against the peace and dignity of the State of Oregon[.]"

The state and federal constitutions give defendant the right to be informed of the particular charges against him. Specifically, Article I, section 11, of the Oregon Constitution, provides that, "[i]n all criminal prosecutions, the accused shall have the right to * * * demand the nature and cause of the accusation against him, and to have a copy thereof." The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be informed of the nature and cause of the accusation * * *." In addition, ORS 132.550 requires indictments to contain "[a] statement of the acts constituting the offense in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended."

Defendant argues that the aggravated murder charges in the indictment in the first three counts fail to meet the foregoing statutory and constitutional standards, because they fail to state the particular elements and circumstances that make up the offenses charged. That is so, according to defendant, because, in each case, the aggravated murder count fails to name the victim or circumstances of the underlying felony.

Although defendant concedes that an indictment usually is sufficient if it tracks the wording of the statute on which it is based[6] (as the indictment in the present case does), he argues that, in this case, more is required because the

---

[6] *See, e.g., State v. Fair*, 326 Or 485, 490, 953 P2d 383 (1998) (racketeering indictment sufficient although it did not set out with particularity the nexus among the predicate offenses); *State v. Montez*, 309 Or 564, 597, 789 P2d 1352 (1990) (aggravated murder indictment alleging aggravating factor of concealment of other crimes sufficient, although it did not set out the elements of those other crimes).

three aggravated murder counts do not inform him of how or against whom the attempted robbery, attempted second-degree kidnaping, and attempted murder were alleged to have been perpetrated. In support of that proposition, defendant cites *State v. Sanders*, 280 Or 685, 688-90, 572 P2d 1307 (1977), in which this court observed that there are occasions when an indictment must state, directly and with certainty, the particular circumstances of a crime in order to bring a defendant within the condemnation of a statute.[7]

Additionally, defendant argues that the vagueness of the indictment impermissibly would permit the state to shift theories of the case after indictment. Defendant derives that argument from the general rule that variance between the indictment and the proof presented at trial is fatal if it misleads a defendant in making a defense or exposes a defendant to the risk of being put in jeopardy twice for the same offense.[8] *See State v. Anderson*, 241 Or 18, 21, 403 P2d 778 (1965) (stating rule). Defendant also asserts that the principle is analogous to the requirement, which this court announced in *State v. Boots*, 308 Or 371, 780 P2d 725 (1989), that jurors unanimously must agree on a specific theory of the factual circumstances that elevate a murder to aggravated murder.

As one illustration of the problem, defendant points to Count 3 of the indictment, which alleges aggravated murder committed to conceal the identity of the perpetrator of attempted murder. Defendant argues:

---

[7] In *Sanders*, this court held that an indictment charging burglary was insufficient, despite the fact that it tracked the wording of the statute, because it did not specify what crime the defendant had intended to commit when he entered the dwelling in which the burglary was committed.

[8] In that connection, defendant also contends that the indictment, as worded, was not sufficiently specific to permit him to assert double jeopardy as a defense to any subsequent prosecution for attempted robbery, attempted kidnaping, or attempted murder, involving victims other than those involved in the felony charges underlying the aggravated murder charges. In response, the state correctly points out that ORS 131.515 bars the state from charging defendant for offenses arising out of the "same criminal episode." "Criminal episode" is defined in ORS 131.505(4) as "continuous and uninterrupted conduct that establishes at least one offense and is so joined in time, place and circumstance that such conduct is directed to the accomplishment of a single criminal objective." It is not subject to dispute that all of the crimes with which defendant potentially could have been charged in this case arose out of the same criminal episode.

"On the basis of the evidence presented by the state at trial, the attempted murder victim could have been Anissa Calderon, Valencia Edwards, William Hall, James Riley or Kim Keaton's young grandson as he ran to the car toward where Mr. Hall was shot. Because the indictment is vague as to this material fact, the trial court was unconstitutionally forced to guess on the factual and legal theory found by the grand jury."

The state responds that an indictment is not required to be as specific as defendant contends, and cites various cases in which this court has held that persons' names, although relevant, need not be pleaded specifically in an indictment. *See, e.g., State v. Rood*, 234 Or 196, 380 P2d 806 (1963) (charging instrument need not specify names of purchasers of lottery tickets in prosecution for sale of lottery tickets); *State v. Nussbaum*, 261 Or 87, 94, 491 P2d 1013 (1971) (indictment for crime of rioting need not include names of co-rioters). In addition, the state notes that defendant did not attempt to clarify the matter for the jury by requesting special instructions regarding the aggravated murder counts, nor did he except to the instructions given.

■ The indictment itself indicates that defendant was alleged to have committed more than one attempted robbery and more than one attempted murder. Moreover, the facts as proved at trial would support more than one charge of kidnaping. Under those circumstances, we agree that defendant would have been entitled to require the state to specify which particular facts and circumstances made up the underlying crimes on which the charges of aggravated murder were based. But that fact alone does not justify overturning the indictment at this stage of the proceeding.

■■ Defendant did not demur or otherwise object to the indictment. This court often has held that objections to the sufficiency of an indictment not timely raised are waived. *See, e.g, State v. Montez*, 309 Or 564, 597, 789 P2d 1352 (1990) (objection to indictment at end of trial was untimely); *State v. Holland*, 202 Or 656, 667, 277 P2d 386 (1954) (defendant who fails to demur at time of arraignment waives objection to indictment). Defendant argues that this court should exercise its discretion to consider his arguments as to the indictment's alleged deficiencies, despite the failure to

demur, either on the ground that those deficiencies constitute error apparent on the face of the record, ORAP 5.45(2), or on the ground that the indictment's alleged deficiencies constitute a jurisdictional problem and, therefore, may be raised at any time.

Error is apparent on the face of the record only when "the legal point is obvious, not reasonably in dispute." *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). Given that this court repeatedly has held that an indictment that tracks the wording of the statute is sufficient, we do not think that defendant's legal point is so obvious that it can be said to merit reversal, notwithstanding defendant's failure to object. Defendant's jurisdictional argument also is not well taken.

■ Our disposition of defendant's arguments concerning the indictment does not end the matter, however. In the course of examining the record in this case concerning defendant's challenge to the indictment, we have reviewed the jury instructions that the trial court gave. Those instructions do not appear to clarify any of the matters that we have discussed. That is, although the three aggravated murder counts were based on three underlying felonies, the instructions did not identify for the jury the victim or attendant circumstances applicable to each of those underlying felonies or in any other way ensure jury unanimity concerning those issues.

The foregoing discovery concerning the jury instructions led this court to pose supplemental questions to, and ask for additional briefing from, the parties. The questions were:

"1. Did the jury instructions given in the present case meet the specificity requirements for such instructions established in *State v. Boots*, 308 Or 371, 780 P2d 725 (1989)? More specifically, was it necessary for the instructions concerning each of the counts of aggravated murder to require the jury to agree as to the identity of the victim of the alleged underlying felony and, if so, did the instructions meet that requirement?

"2. Assuming that the instructions in question were not sufficiently specific, did defendant object to the error? If not, was the error apparent on the face of the record under

the rationale of *State v. Brown*, 310 Or 347, 800 P2d 259 (1990)?"

Although the parties' briefs in answer to our questions vary widely with respect to what consequences, if any, should flow from the procedural facts, both sides appear to agree that: (1) the instructions in question did not identify the victim of the alleged underlying felony with respect to any of the three counts of aggravated murder; and (2) defendant did not make any contemporaneous objection concerning those omissions. We turn to the parties' arguments concerning the legal effect of those procedural facts.

The state argues that this court should not address the matter for three reasons. First, the state argues that the failure of the instructions to specify the victim of the underlying felony is not *plain* error, because this court never has held that that sort of specificity is required and, therefore, there was no violation of a firmly established legal principle. Second, the state argues that any error was harmless, because there was no actual dispute or confusion at trial as to the identity of the victims of the underlying felonies. Third, the state asserts that the trial court's instructions were adequate in any event.

We address the last point first because, if the instructions given were adequate, the other arguments are irrelevant. For the reasons that follow, we conclude that the instructions were not adequate.

The starting point for our inquiry in this respect begins (and ends) with *Boots*. In that case, the defendant was charged with aggravated murder based on two separate aggravating factors, *viz.*, the murder was committed in the course of a robbery, and the murder was committed to conceal the identity of the robbers. 308 Or at 374. The trial court specifically instructed the jurors that they were not required to agree unanimously on any particular theory, so long as some combination of the 12 jurors agreed that one or the other (or both) of the alleged aggravating factors had been proven. This court held that that instruction was erroneous because, in order to convict a defendant of aggravated murder, the jury must agree unanimously on all the facts required by a particular subsection of the aggravated murder

statute, ORS 163.095. *Id.* at 377. In reaching that conclusion, the court stated:

> "Of course[,] jurors cannot convict a defendant if they unanimously agree that he intended to kill a person but only half believe that he did so. No more can they convict if they unanimously agree that a defendant's act caused a person's death but only half believed that he acted intentionally. The same is true if jurors agree that a defendant's act caused a person's death but do not agree that the defendant committed a felony, or vice versa."

*Id.* In addition, the court quoted with approval from *United States v. Gipson*, 553 F2d 453 (5th Cir 1977), a case in which a defendant was charged with being a person who "receives, conceals, stores, barters, sells, or disposes of" a stolen vehicle in interstate commerce. In that case, the trial court had instructed the jury that they need not agree on which of those acts the defendant had done. The federal court ruled that that instruction was erroneous, stating:

> "Like the 'reasonable doubt' standard, which was found to be an indispensable element in all criminal trials * * *, the unanimous jury requirement 'impresses on the trier of fact the necessity of reaching a subjective state of certitude on the facts at issue. * * * *The unanimity rule thus requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged.* Requiring the vote of twelve jurors to convict a defendant does little to insure that his right to a unanimous verdict is protected unless this prerequisite of jury consensus as to the defendant's course of action is also required."

*Gipson*, 553 F2d at 455-56 (citations and footnote omitted; emphasis added), quoted in *Boots*, 308 Or at 380.

■ It is plain from the foregoing that the jury in the present case properly could not have convicted defendant of aggravated murder, for example, based on murder committed to conceal one's identity as the perpetrator of attempted murder, if half the jurors thought that defendant had attempted to murder Riley and half thought that he had attempted to murder Edwards. As in the passage from *Gipson* that this court quoted with approval in *Boots*, the unanimity rule requires that the jury agree as to "just what

defendant did" to bring himself within the purview of the particular subsection of the aggravated murder statute under which he was charged.

It is true that *Boots* is distinguishable factually, because the trial court in the present case did not instruct the jurors expressly that they could convict defendant in the absence of unanimity respecting which underlying felonies defendant had committed. However, because the aggravated murder instructions that were given did not either limit the jury's consideration to a specified underlying felony or require jury unanimity concerning a choice among alternative felonies, each instruction carried the same danger that this court had condemned in *Boots*. We can perceive of no reasonable basis for refusing to apply the rule of *Boots* to the present case. As a legal matter, the jury instructions were erroneous.

We turn next to the state's argument that any errors that may have been committed in the jury instructions were harmless.

■ At the outset, we note that that argument is based, at least in part, on the fact that, in the state's view, the prosecutor ensured jury unanimity by clarifying the matter for the jury, in that he made clear in his closing argument that counts 1 and 2 were based on defendant's robbery and attempted kidnaping of Keaton and that count 3 was based on defendant's attempted murder of Edwards. This court previously has rejected the notion that counsel may fill in the blanks to redeem an erroneous jury instruction. In *Brown*, 310 Or at 356, this court stated that

> "neither the sufficiency of the evidence nor the completeness of counsel's arguments concerning that evidence is a substitute for the sufficiency of the instructions. As is usually the case, the trial court cautioned the jury that what the lawyers argue is not evidence and that it is the court's function to instruct the jury as to the law."

In the present case as well, the prosecutor's arguments were not a legally sufficient substitute for necessary jury instructions.

The state's principal argument is that the present case is distinguishable from *Boots*. The state acknowledges that *Boots* requires jury unanimity on all material facts. It argues, however, that the names of the victims or the other details of the underlying felonies in the aggravated murder charges in the present case are not material facts and, therefore, need not be identified to the jury. The state contends that

> "this is not a situation where there was any possibility that any of the jurors could have found that defendant by different acts in a different location at a different time committed an attempted robbery and kidnapping and then murdered Hall in relation to those crimes. The facts establish only a *single* attempted robbery and attempted kidnapping that occurred at a discrete time and place by a single series of acts. The same is true for the attempted murder, particularly given the jury's acquittal of defendant on the second charge [that defendant attempted to murder Riley]."

Implicit in the state's argument is the notion that, if there *is* a possibility of jury confusion, the identity of the victim or the circumstances of the underlying felony *is* information that is material and for which jury unanimity is required. The state merely assumes that it proved adequately the underlying felonies and that there was no way that the jury could have been confused as to what was being referred to as the underlying felony in each count. As our discussion of *Boots* indicates, we agree with the state's premise. As the discussion that follows will explain, however, we disagree with the state's assertion that no juror confusion was likely.

■ We turn to an examination of each of the three aggravated murder counts, to determine whether there was a substantial likelihood of jury confusion as to the underlying felony that was applicable to each count. The first aggravated murder count was based on defendant's intentional murder of Hall in connection with his attempt to commit the crime of first-degree robbery. The state argues that the underlying felony charged in this count refers to the robbery that occurred when defendant tried to force Keaton to drive him away from the scene, immediately before killing Hall. That robbery was not charged separately. However, as noted,

defendant *was* charged with (and convicted of) robbery based on his hijacking of the pickup truck immediately after he killed Hall. In the absence of instructions clarifying the circumstances of the particular robbery referred to, it is impossible to determine whether, in convicting defendant on the first count, the individual jurors believed that defendant committed robbery with respect to Keaton or with respect to the pickup truck.

■ The second aggravated murder count was based on the intentional murder of Hall in connection with the crime of attempted kidnaping. As to that felony charge, both Keaton and her grandson were possible victims. The kidnaping also was not charged separately. Again, in the absence of explicit jury instructions, jury unanimity on a particular attempted kidnaping victim was not ensured.

■ Finally, the third aggravated murder count was based on the intentional killing of Hall to conceal defendant's identity as the perpetrator of attempted murder. As noted, defendant was charged separately with two counts of attempted murder—one involving Edwards and the other involving Riley. The state asserts that the attempted murder referred to in the third aggravated murder count was the Edwards crime. The only way in which that notion was conveyed to the jury, however, was in the prosecutor's statement to the jury. As the court concluded in *Brown,* that statement was not a substitute for the sufficiency of the instructions. *Brown,* 310 Or at 356. Because nothing in the instructions respecting the third count required the jury unanimously to decide whether defendant was attempting to conceal his identity as the perpetrator of the attempted murder of Edwards or of Riley, the instructions also were erroneous respecting that count.

Unlike the errors respecting the instructions on the first two counts, however, we agree with the state that the error in the instructions respecting the third count was harmless. The jury acquitted defendant of the attempted murder of Riley (10-2), but it unanimously convicted him of the attempted murder of Edwards. Because that conviction proves that all 12 jurors agreed that defendant attempted to murder Edwards, that conviction provides the predicate for

defendant's conviction on the third count of aggravated murder.

Having concluded that there was error in the instructions concerning all three counts of aggravated murder and that the errors respecting the first two of those counts were not harmless, we turn to whether the errors respecting the first two counts of aggravated murder were "apparent on the face of the record."

■ ■ We hold that they were. The elements of "error apparent on the face of the record" are that: (1) the error is one of law; (2) the point of law is obvious, *i.e.*, is not reasonably in dispute; and (3) the error is not one respecting which the court must go outside the record or select among competing inferences. *Brown*, 310 Or at 355. The first and third elements are not really at issue; the question of what must be included in a jury instruction is a question of law, and what was or was not included is determined readily by examining the instructions that were given. Therefore, the only issue is whether the errors were "obvious."

We conclude that they were. It has been clear in Oregon, at least since *Boots*, that a jury must be instructed concerning the necessity of agreement on all material elements of a charge in order to convict. The factual distinctions between the present case and *Boots* are not such that a court reasonably could doubt what its duties respecting jury instructions would be.

In summary, we hold that the trial court erred in failing to instruct the jury fully respecting the three counts of aggravated murder. We further hold that, with respect to the first two of those counts, the error was not harmless. We hold that the error was harmless with respect to the third count. Finally, we hold that, although defendant did not object at the time, the errors respecting the first and second counts were apparent on the face of the record. Defendant's convictions for aggravated murder respecting the first two counts must be reversed and the case remanded to the trial court for further proceedings. However, because we do not reverse defendant's conviction for aggravated murder on the third count, we proceed to examine defendant's other assignments of error.

## IV. JURY SELECTION

Defendant raises three assignments of error arising out of the jury selection process. First, defendant contends that the trial court erred in rejecting his for-cause challenge to one juror, Nunez, who had expressed his personal views in favor of the death penalty. Second, defendant contends that the trial court erred in excusing for cause two other prospective jurors, Warren and Robotham, who expressed their personal opposition to the death penalty. Third, defendant claims that the prosecutor improperly vouched for his case during the *voir dire* process by stating that he "anticipated" that defendant would be found guilty of aggravated murder and that there would be a penalty phase to the trial. We do not consider that third assignment of error, because it was not preserved in the trial court and, in any event, this court rejected that precise claim in *State v. Nefstad*, 309 Or 523, 526-27, 789 P2d 1326 (1990) (prosecutor's statement to effect that "I anticipate" there will be a penalty phase to the trial held not to constitute improper expression of belief in the defendant's guilt). For the reasons that follow, we also conclude that neither of defendant's other jury selection arguments is well taken.

██ ██ Jurors may be challenged for cause on the basis of, among other things, actual bias.[9] ORCP 57 D(1)(g) (incorporated by reference and made applicable to criminal trials in ORS 136.210(1)). The determination whether a prospective juror actually is biased is a factual question "to be determined by the trial court in the exercise of its discretion." *Montez*, 309 Or at 574-75; ORCP 57 D(1)(g). Because the trial court has the advantage of observing the challenged prospective juror's demeanor, apparent intelligence, and candor, that court's judgment as to a prospective juror's ultimate qualifications is entitled to great weight. *Montez*, 309 Or at 575; *Lambert v. Srs. of St. Joseph*, 277 Or 223, 228-29, 560 P2d 262 (1977). Accordingly, the trial court's decision will not

---

[9] "Actual bias" is defined in ORCP 57 D(1)(g) as "the existence of a state of mind on the part of a juror that satisfies the court, in the exercise of sound discretion, that the juror cannot try the issue impartially and without prejudice to the substantial rights of the party challenging the juror."

be disturbed absent a finding of "a manifest abuse of * * * discretion." *Nefstad*, 309 Or at 528.

■ As this court stated in *Montez*, "[a] prospective juror's approval of or opposition to the death penalty alone is not determinative of whether the juror may serve as a juror or must be excused. The question is whether the prospective juror's views would prevent or substantially impair the performance of his or her duties if selected as a juror." 309 Or at 575. The trial court makes that determination by looking at the totality of the potential juror's *voir dire* testimony to discern whether it suggests the " 'probability of bias.' " *Nefstad*, 309 Or at 537 (quoting *Lambert*, 277 Or at 230).

■ Defendant argues that Nunez should have been excluded for cause, because he had expressed a general view in favor of the death penalty for individuals convicted of aggravated murder. However, as explained above, the fact that a juror favored the death penalty would not necessarily disqualify the juror from serving as a juror. The question, then, is whether there is evidence in the record to support the trial court's conclusion that Nunez could serve as a fair and impartial juror. There is such evidence.

Both in his questionnaire and in his response to defense counsel questioning, Nunez responded that he did not believe that the death penalty was appropriate in all cases of aggravated murder. He also expressed his belief that he could put aside his feelings regarding the death penalty and make a decision in the case on the basis of the evidence and the court's instructions. His *voir dire* examination does not establish that he was biased against defendant personally or that he was unable to follow the law. The trial court was entitled to believe that Nunez would be a fair and impartial juror. We find no error.

Defendant also contends that the trial court abused its discretion (and therefore erred) in excluding Warren and Robotham on the state's for-cause challenge. Defendant argues that the record with respect to each juror demonstrates that they could have put aside their personal opposition to the death penalty, fairly heard the evidence, and followed the court's instructions. Defendant argues that, under *Gray v. Mississippi*, 481 US 648, 107 S Ct 2045, 95 L Ed 2d

622 (1987), the improper exclusion of a juror never is harmless error and that, therefore, he is entitled to a new trial.

The issue, again, is whether there is evidence in the record to support the trial court's determination that Warren and Robotham would not be fair and impartial. Our review of the record satisfies us that there was ample evidence to support the trial court's conclusion as to each of those jurors.

■ Warren expressed significant hesitancy in her ability to impose the death penalty. In her jury questionnaire, she indicated that she was "not sure" of her feelings about the death penalty. During the *voir dire* examination, she stated that she was neither for nor against the death penalty but, upon questioning by defense counsel, she explained,

> "I wouldn't think I could make a decision if someone should die or not. I feel that's God's decision. If it should be, it should be. But I don't think I could ever condemn somebody to death. I don't think I could."

On further inquiry from defense counsel, Warren stated that she would follow the court's instructions with respect to the four death-penalty questions. However, when the prosecutor and the trial court probed her views, Warren repeatedly stated that she did not think that she could make the decision to sentence someone to death, regardless of the evidence. In response to defense counsel's efforts to rehabilitate her, Warren ultimately stated, when asked if she could vote "yes" to the penalty-phase questions, "I could do it, yes. Yes, I could do it."

At the conclusion of the *voir dire* examination, the trial court excused Warren for cause. The court ruled:

> "I am going to grant the state's motion despite the answer to the last question. It is pretty apparent to me that Ms. Warren's beliefs have changed since she did fill out the questionnaire. Her beliefs are such that they would substantially interfere with her ability to decide the questions that will be put to her in the penalty phase of the case."

In response to defendant's continued objection to excusing Warren, the trial court explained its ruling in further detail:

> "I realized her response to the last question. I did note that. My problem is, I guess among other things, it is pretty

clear to me she pretty much would agree with any proposition put to her on the issue. Just judging her responses to the questions from both sides, the problem that she has with conscientious beliefs are such that she did pretty clearly, and to me more forthrightly, indicate that she would not consider properly the possibility of deciding to impose a death sentence based on her beliefs.

"I think that her responses, what she said earlier, she would try to follow the court's instructions and the law that applies to the case are the more honest answers to the questions put to her. In essence, in the final analysis, even saying she could try to put aside her beliefs, she indicated that she really could not vote for the question in the affirmative. It is clear to me that her views would be such that she would be pretty substantially impaired in terms of following the legal requirements."

The foregoing demonstrates that the trial court gave due consideration to all of Warren's statements and, based on those statements and on the court's observation of her demeanor and candor, determined that she would be unable to be fair and impartial. Because of the contradictory nature of Warren's various responses, we think it particularly important to defer to the trial court's determination. *See Nefstad*, 309 Or at 538 (according trial court's conclusions great weight under similar circumstances). The record supports the trial court's factual findings respecting Warren's ability to perform her role as a juror. We find no error.

Robotham also expressed contradictory views concerning the death penalty. In his jury questionnaire, he indicated strong disagreement that most murderers should receive the death penalty, expressed no opinion whether he could vote to impose the death penalty, and indicated that he had such strong feelings against the death penalty that he would be unable to be fair and impartial. During *voir dire*, Robotham stated that, philosophically, he opposed the death penalty, explaining, "[a]side from the fact that an innocent person could be convicted, I am basically opposed to the State taking a life."

During questioning by defense counsel, Robotham moderated the foregoing statements by repeatedly answering that he thought that he would be able to answer the four

death-penalty questions fairly and impartially, and that he thought that he would be able to follow the court's instructions. On further questioning by defense counsel, Robotham indicated that he had changed his mind since completing the *voir dire* questionnaire and had changed his "no opinion" response to the question whether he could vote for the death penalty to "Yes, I think I could" vote to impose the death penalty.

In answer to the prosecutor's questions whether Robotham thought that his strongly held views against the death penalty substantially would impair his ability to have a role in executing defendant, Robotham answered:

"Well, I guess all I could say is I make an effort to follow the law. I think a completely open mind is a myth.

"* * * * *

"But that's all—I would make an effort to give an impartial judgment."

On further questioning by the prosecutor, Robotham emphasized repeatedly that, although he would make every effort to be fair, he could not say for sure whether his opposition to the death penalty or even the presence of defendant in the courtroom for a few weeks might impair his ability to follow the law. Moreover, when asked to consider the matter in terms of percentages, he estimated that there was a 60 percent chance that he could put his feelings regarding the death penalty aside. Finally, during further questioning by defense counsel, the following interchange took place:

"Q. [I]f you felt the State had proven beyond a reasonable doubt on all four questions yes, could you vote yes on all four questions based upon evidence and the instructions?

"A. Well, again, I think I could.

"Q. You would try your hardest?

"A. Again, I don't feel comfortable to say yes or no. I think I could.

"Q. So basically you are saying, given everything we discussed, all the questions [the prosecutor] asked you and I asked you and the judge told you, do you think you can be

fair to both sides in this case given the issues of the death penalty?

"A. Yes."

The trial court granted the state's motion to excuse Robotham for cause. In so doing, the court stated:

"I find that even though he has indicated that he would try to set aside his personal beliefs against the death penalty, he did indicate that he would have a 60\40 percent difficulty in setting aside his opinions and that is certainly a substantial infringement upon his capacity to follow the court's instructions and follow the law that applies."

Again, the trial court, having had the opportunity to observe Robotham's demeanor and to listen to the tone of his answers, was in the best position to determine whether Robotham would be able to be a fair and impartial juror. The trial court concluded that Robotham's strong opposition to the death penalty would prevent him from following the court's instructions, notwithstanding his firm and sincere commitment to try to do so. As our recitation of the record shows, there was evidence to support the trial court's conclusion. We find no error.

## V. DEFENDANT'S RIGHT TO TESTIFY

Defendant contends that the trial court denied him his constitutional right to testify on his own behalf and, accordingly, that he is entitled to a reversal of his convictions. A brief recitation of the facts pertinent to the resolution of this issue is helpful.

During the trial, defendant advised the court several times that he wished to testify. Nonetheless, the question as to the circumstances under which and the effect to which defendant would testify was a frequent subject of discussion among the lawyers, defendant, and the court. On one such occasion toward the end of the defense case (May 27, 1993), one of defendant's lawyers informed the court that defendant wished to testify before one of the psychiatric witnesses was called to the stand. Defendant's other lawyer also advised the court that defendant wished to testify that day, and defendant himself so advised the court. The trial court replied that, because of their travel schedules, two psychiatric witnesses

would testify that day instead and that defendant could testify "tomorrow or next week or whenever." Later that day, defendant reiterated, "I do state here that I do want to take the witness stand though." At the conclusion of the psychiatric testimony, court adjourned until June 7, 1993.

On June 7, 1993, the court heard testimony from three witnesses for the defense and one witness for the prosecution. Defendant did not state that day his intention to testify. The next day, June 8, 1993, after testimony from one defense witness, the court called a recess. Then, in open court, outside the presence of the jury but in front of defendant, the prosecutor, the court, and defense counsel engaged in an extended discussion concerning the defense's intention to rest its case. Defense counsel informed the court that it intended to rest its case with the proviso that it might still call a certain witness for surrebuttal. Neither defendant nor his counsel stated on the record or otherwise suggested in any manner that defendant still wished to testify. When the jury was called back into the courtroom, the trial judge informed the jury, in front of defendant, that the defense had rested its case. Again, defendant remained silent.

The prosecution proceeded with rebuttal witnesses. At the conclusion of that testimony, the state advised the court that it had two remaining witnesses for the next morning. Still, defendant said nothing about testifying, and the court adjourned.

The next morning, June 9, 1993, the court and the parties addressed some procedural matters, the state called its last two witnesses, and the state rested. At no time during the foregoing did defendant mention wanting to testify. After the state rested its case, defense counsel advised the court about a possible surrebuttal witness. Neither defense counsel nor defendant said anything about testifying. After a brief recess, the defense recalled one of its psychiatric witnesses for a brief surrebuttal. After that witness was finished, defense counsel advised the court that defendant "may want to testify."

At that point, the trial court and defendant engaged in a lengthy colloquy, during which defendant asserted that it was his recollection that the trial judge had told him earlier

that, if he wanted to testify, he would have to "wait until the last person to testify." The court responded, correctly, that he had told defendant no such thing. Nonetheless, defendant insisted that that was what he had understood from the statements made to him by the court and that was the reason that he had been sitting silently waiting for the conclusion of the trial. Additionally, he stated:

> "[N]ow I would like to testify here. But I would want to sit down and confer with my attorneys tonight before I do that, because I want to go over the questions and what have you with them, because they haven't done that with me yet.
>
> "And I think that again, for the record, I would like to say that both my attorneys have been somewhat reluctant to have me get up and testify on my own behalf, while I've wanted to get up and testify on my own behalf. What their reasons are for not wanting me to testify, I don't know, but I think that I have the constitutional right to testify in my behalf, in my own defense."

The court responded that, earlier, there had been a discussion about the ground rules for any testimony by defendant and that the lawyers were supposed to have researched the extent to which defendant would be allowed to make a speech as opposed to answering questions, and the extent to which the prosecutor would be allowed to cross-examine defendant. The court pointed out that defendant had said nothing further concerning the matter and that his side had rested. When defendant protested further, the court replied, "Well, I'm also hearing you say that you haven't made a final decision as to whether you're going to testify, and if so, what you're going to say, because you said something a moment ago about conferring with your attorneys this evening."

The court advised defendant and his counsel that it was calling a recess for the day and suggested that "you all go on upstairs and talk about it." The court expressly left the matter open until the next day, but reminded defendant that, if he chose to testify, his testimony would be subject to the rules of evidence that apply to any witness.

When the court reconvened the next morning, defense counsel advised the court that they "spoke to [defendant] last night, and he expressed to us he would like to

address the court." With that brief introduction, defendant personally addressed the court and expressed his concern that, if he testified, his testimony would be limited within a certain "scope." He told the court that, given the other evidence that had been admitted in the case, "it would seem to me I would be able to go over all the issues of my entire life, because my entire life has been brought out before this court, before this jury, and I don't see where the restrictions come in at." In response, the court summarized the status of the case and once again advised defendant:

> "[I]f you were to testify, you'd have to comply with the rules of evidence that apply to every other witness who testifies in court. And you presented your defense earlier in the week and rested, and then the state put on its rebuttal testimony, and then [the surrebuttal witness] testified yesterday, and essentially the case is closed.

> "And only after the case was fully closed did you present the issue last night about wanting to testify, and as I understood it, you still had not discussed with your attorneys what it was you intended to say, which was what the situation was on May 27th as well."

Defendant then repeated his view that he had "the right to be able to testify to anything that pertained to my life, you know, especially before this jury, because right now my life is at stake, and I think if my life is at stake here, then I should be able to convey to the jury everything that has taken place within my life, everything that has happened to me."

The court, defendant, and his lawyers again engaged in a lengthy exchange in which defendant continued to assert, and the court to deny, that defendant had been misled into waiting to testify on his own behalf. During that discussion, the state asserted that defendant should have to make an "offer of proof" as to the content of his testimony. In response, defendant simply reasserted his constitutional right to "tell their side of the story." At no time during that discussion did defendant indicate a willingness to testify subject to the rules of evidence.

At the conclusion of that exchange, defense counsel conferred off the record with defendant. Then defense counsel advised the court, in defendant's presence, that, under the circumstances, *i.e.*, considering the topics that defendant wanted to address, the fact that his testimony would be limited by the rules of evidence and subject to the prosecution's cross-examination, and his lawyers' advice not to testify, defendant had elected not to testify and not to make an offer of proof. Defendant's lead lawyer stated:

"Your Honor, I've just spoken with [defendant]. I did advise him that if he wished to take the witness stand, make an offer of proof on what it is that he would like to say, and in spending some time with him last night, I think we spent about an hour, hour and a half, you know, talking with him, essentially what he would intend to say would be to basically give a rendition of his entire life through and up to the 22nd of August. And as I indicated to [defendant] last night, and I indicated to him just now this morning, that would certainly open up all of these areas for [the prosecutors] to cross-examine on.

"I also explained to [defendant] that he would be under the rules, particularly whenever we talk about the Evidence Code, Rule 403, relevancy, he'd also be under some restrictions. He couldn't talk about what other people said, because those would be hearsay statements, so he would be under the same rules as any other witness.

"I believe he does understand that, and I also pointed out to [defendant] that if he did choose to take the witness stand, while I would have to, as his lawyer and advocate, attempt to ask him questions to lead him through the testimony, he would certainly be doing so against my advice, and against the advice of my co-counsel * * *.

"That all being said, [defendant] does inform me that he has said to the court what he's wished to say to the court, and that he has nothing further to say to the court.

"And so with that, I would at this time formally close the defense case, except for our motions."

Defendant added nothing further on the subject and the court submitted the case to the jury without any further evidence.

Defendant contends that the foregoing colloquies between himself, his lawyers, and the court establish that he repeatedly and unequivocally informed the court that it was his wish to testify in his own defense, that he never waived the right to testify, that defense counsel unilaterally rested the defense case before defendant had the opportunity to testify, and that he "protested his attorney's actions on the record." Defendant argues that the state and federal constitutions guarantee him the right to testify in his own defense[10] and that the law is clear that that right is personal to the defendant and cannot be waived by counsel.[11] *See, e.g., Jones v. Barnes*, 463 US 745, 751, 103 S Ct 3308, 77 L Ed 2d 987 (1983) (defendant has the "ultimate authority to make certain fundamental decisions regarding the case, as to whether to * * * testify in his or her own behalf"). Because of the apparent conflict between defendant and his lawyers concerning the matter, defendant argues, the trial court had a duty to conduct a hearing to determine whether defendant in fact wished to exercise his right to testify or whether defendant instead acceded to his counsel's advice not to testify. According to defendant, the trial court's failure to conduct such a hearing constitutes reversible error. Defendant also contends that, even if he were found to have waived his right to testify at the time when his lawyer rested the defense case, the trial court abused its discretion and denied defendant due process of law when it failed to allow him to reopen his case so that his testimony could be received.

---

[10] In *Rock v. Arkansas*, 483 US 44, 107 S Ct 2704, 97 L Ed 2d 37 (1987), the United States Supreme Court held that the right to testify on one's own behalf in a criminal trial is "one of the rights that 'are essential to due process of law in a fair adversary process.' " 483 US at 51, 97 L Ed 2d at 46 (quoting *Faretta v. California*, 422 US 806, 819 n 15, 95 S Ct 2525, 45 L Ed 2d 562 (1975)). The Court in *Rock* explained that the right to testify has "sources in several provisions of the Constitution," including the Fourteenth Amendment guarantee that no one shall be deprived of liberty without due process of law, the Sixth Amendment Compulsory Process Clause guarantee of the right of a criminal defendant to call witnesses, and the Fifth Amendment guarantee against compelled testimony. *Id.* at 51-53, 97 L Ed 2d at 46. In addition, the right to testify on one's own behalf is guaranteed under Article I, section 11, of the Oregon Constitution, which provides: "In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel * * *."

[11] We assume, for purposes of this opinion, that the right to testify under the Oregon Constitution also is personal to the defendant and may not be waived by counsel, although, to date, this court has not had occasion to consider that precise question.

The state, in response, agrees with defendant that a defendant has the right to testify on his own behalf in a criminal prosecution and that the right is personal to the defendant, but it argues that the colloquies summarized above establish that, as a factual matter, defendant, with the assistance and knowledge of counsel, knowingly and voluntarily waived his right to testify.

After reviewing the record, we agree with the state that the trial court was entitled to conclude that defendant had waived his right to testify in his own behalf at the close of the defense case. Although it is true that, at various times, defendant had expressed a desire to testify, he remained silent at all critical moments when his lawyers and the court discussed resting the defense case. Given defendant's loquacious participation in earlier discussions on the topic, his silence at that moment spoke volumes. Defendant does not argue that trial courts have an affirmative duty to determine whether a silent defendant has knowingly and intentionally waived his constitutional right to testify. Indeed, defendant concedes that the courts do not have such a duty.[12] Accordingly, when defendant's counsel rested the case in open court, without calling defendant to testify or notifying the court of his desire in that regard, the trial court was permitted to assume that defendant and his lawyers mutually had decided that defendant would not testify.

That defendant now insists that he had not meant to waive his right to testify does not alter that conclusion. This is not a proper forum for an inquiry into the content of defendant's private conversations with his lawyers or whether the lawyers actually were acting in accordance with defendant's wishes. Such questions are more appropriately addressed, if at all, in a future post-conviction proceeding. We consider the facts as they appeared to the court at the time when the defense rested. Because defendant remained mute while his lawyers rested the defense case, the court was entitled to assume and, as is apparent from the court's remarks, did in fact assume that defendant acquiesced in his lawyers' actions.

---

[12] In light of defendant's concession, which we accept, we do not address the issue separately.

■ Additionally, the record does not support defendant's assertion that the trial court separately denied defendant the right to reopen the case so that his testimony could be received. It is apparent from the trial court's remarks to defendant on the second-to-last day of the trial that defendant would have been permitted to testify the next day if he had been willing to follow the rules of evidence. Defendant conferred with his lawyers on the matter and defendant's lead counsel informed the court that defendant "does inform me that he has said to the court what he's wished to say to the court, and that he has nothing further to say to the court." Defendant does not contend that the trial court should have allowed him to testify without restrictions. Under the circumstances, then, defendant waived his right to testify a second time at the conclusion of the trial. The trial court did not deny defendant his right to testify; there was no error.

## VI. EVIDENTIARY MATTERS

Defendant makes seven different arguments concerning the trial court's assertedly erroneous admission or exclusion of evidence. For the reasons that follow, none of those arguments is well taken.

### A. *Exclusion of Audiotape*

Defendant argues that the trial court erred in excluding an audiotape of an interview, which was offered to rehabilitate the credibility of a defense witness regarding the exchange of gunfire between defendant and Hall near Fourth and Alder. On the day after the shooting, the witness, Gates, told both a police investigator and a defense investigator, in separate interviews, that she was standing on the corner of Fourth and Alder Streets when she heard someone shout, "Oh, he's got a gun," that she then looked around, heard a gunshot, and, *after hearing the gunshot*, saw a man who later was identified as defendant pull a gun out of the back of his pants. During her examination at trial, however, Gates retreated from her prior statements. She testified that, on reflection, she was not absolutely sure whether she had heard the gunshot before or after she saw defendant pull out the gun. The trial court allowed defendant to introduce the notes of the police investigator who had interviewed Gates on the day after the shooting, which confirmed what Gates had

told the investigator concerning the order of events. However, the trial court excluded an audiotape of Gates's interview with the defense investigator, in which Gates had conveyed the same information.

In a later discussion outside the presence of the jury, defense counsel argued that Gates's tape-recorded statement was admissible to rehabilitate her credibility and to substantiate her prior consistent statement.[13] In response, the prosecution argued that Gates's tape-recorded statement was cumulative and irrelevant. The trial court ruled that, because Gates had testified at trial to the fact that she had told the police investigator and the defense investigator immediately after the event that she had heard the gunshot before seeing defendant pull out his gun, there was nothing to rehabilitate. The trial court did not permit the jury to hear the audiotape.

Defendant repeats in this court his argument that the trial court erred in excluding the tape, because the tape was admissible under OEC 801(4)(a)(B) as a prior consistent statement "offered to rebut an inconsistent statement or an express or implied charge against the witness of recent fabrication or improper influence or motive." At trial, Gates testified that she did not become unsure of her recollection until after she had been interviewed by the Deputy District Attorney in the case. Defense counsel argued that Gates's memory problem was a result of an improper motive stemming from pressure put on her by the prosecutor's office. Further, defendant now argues that, while the police report that was admitted gave a written version of her earlier statements, that report could not capture the demeanor evidence that defendant was attempting to elicit with the audiotape and, therefore, the audiotape was not merely cumulative of either Gates's prior trial testimony or of the report. Finally, defendant argues that the trial court's alleged error was not harmless, because it showed that decedent Hall fired at defendant

---

[13] Defendant asserted that, during the trial, Gates sounded muddled and confused, whereas, in the interview tape, Gates sounded sure and confident. Defendant argued that the jury should have been able to hear Gates's voice when she clearly and consistently gave the investigator information about the shooting. We decline to characterize how Gates sounds on the interview tape, because the correctness of the trial court's ruling does not depend on it.

first, before defendant pulled his gun from his pants, and such evidence bolstered defendant's trial theory that defendant was not the initial aggressor and was justified in acting in self defense.[14]

■■■■■ Under the Oregon Evidence Code (OEC), evidentiary error is not presumed to be prejudicial. OEC 103(1). A defendant in a criminal case assigning error to the exclusion or admission of evidence must establish that the error was not harmless. Article VII (Amended), of the Oregon Constitution, requires appellate courts to affirm a conviction, notwithstanding any evidentiary error, if there is substantial and convincing evidence of guilt and little likelihood that the error affected the verdict. *State v. Van Hooser*, 266 Or 19, 23-26, 511 P2d 359 (1973) (affirming convictions despite statutory error, holding that constitutional provision does not permit reversal if "there was substantial and convincing evidence of guilt [and] the error committed was very unlikely to have changed the result at trial"). Under the United States Constitution, the court must determine whether the error is harmless beyond a reasonable doubt. *Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705, 710-11 (1967).

■■■■ In this case, we need not consider the merits of defendant's argument concerning the admissibility of the audiotape under OEC 801(4) because, after carefully reviewing the record, we conclude that defendant has failed to show that any error in excluding the tape was likely to have affected the verdict. As noted, at the trial, Riley testified that defendant had pulled out his gun *before* the first shot was fired and Gates testified that she had told the investigators after the incident that defendant had pulled his gun out *after* the first shot was fired. However, all of the witnesses to the exchange of gunfire at Fourth and Alder (including Gates) testified that the words, "He's got a gun," preceded the first shot. Moreover, all of those witnesses who knew decedent Hall testified that it was Hall who uttered those words.

---

[14] Defendant also argues that the audiotape was admissible under OEC 803(5) as a recorded recollection and that exclusion of the audiotape violated certain of his state and federal constitutional rights. Those arguments were not preserved and we do not consider them.

The only reasonable inference to be drawn from the fact that, before any shot was fired, Hall exclaimed that defendant had a gun, was that Hall felt that either he or others nearby were in danger from defendant and his gun. Under those circumstances, it would not matter whether Hall or defendant fired the first shot. If Hall perceived that defendant was about to use his gun, Hall would have been justified in firing the first shot, which undercuts defendant's self-defense theory. Thus, even if the trial court erred in excluding the audiotape from evidence, there is little likelihood that the error affected the verdict. We conclude that any error was harmless beyond a reasonable doubt.

## B. *Exclusion of Testimony as to Victim's Character*

■ Defendant also contends that the trial court erred in sustaining the prosecutor's objection to the admission of testimony of Hancock, who had been Hall's supervisor when Hall worked as a police officer for the City of Boardman. Defendant wished to elicit testimony about specific instances of Hall's past conduct which, he claimed, tended to show that Hall was reckless and dangerous, and acted outside of established rules and procedures for police work. Defendant claimed that evidence of that conduct was relevant to his self-defense theory, because it supported his contention that Hall had initiated the gunfight that resulted in his death. The prosecution objected that Hancock's testimony was not relevant. The trial court sustained the objection on the grounds that Hancock's testimony would be both irrelevant and unduly prejudicial, inasmuch as it tended to blacken Hall's character.

Defense counsel then called Hancock to the stand in an offer of proof. Hancock testified that he had trained Hall in 1987 (approximately five years before the shooting), when Hall was a probationary police officer for the Boardman Police Department. Hancock testified that he felt that Hall was performing inadequately as a police officer and recounted two instances in which Hall had been called to a situation that had called for an arrest, but either had failed to request backup or to make an arrest. He also testified that he had had no reason to believe that Hall was a violent or aggressive person.

■ At the conclusion of the offer of proof, the trial court adhered to its previous ruling. Among the reasons for its ruling, the court stated:

"You haven't got the evidence * * * to rise to the level of habitual conduct that this was his habitual response to overreact, which is kind of what you are arguing here.

"You have got two instances in Boardman some time between January of '87 and later in the fall of '87 and that doesn't rise to the level of habitual behavior on the part of Mr. Hall."

Under OEC 404(2)(b), evidence of a pertinent character trait of the victim of a crime, offered by an accused, is admissible for the purpose of proving that the victim acted in conformity therewith.[15] The trial court concluded that Hancock's testimony about two instances, five years earlier, in which Hall had failed to follow police procedure, did not establish a character trait for acting in a reckless, erratic, or dangerous manner and, therefore, was not relevant. We agree with that assessment.[16] The trial court correctly excluded Hancock's testimony.

---

[15] OEC 404(2)(b) provides:

"Evidence of a person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:

"* * * *

"(b) Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same * * *."

[16] Moreover, the proffered testimony also was inadmissible, because defendant failed to offer it in a permissible form. Proof of a character trait of a victim must be given in the form of an opinion; only on cross-examination is it permissible to inquire into specific instances of conduct. OEC 405(1). That section provides:

"In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct."

Here, Hancock did not testify as to his opinion of Hall's general reputation for dangerousness or recklessness and, in fact, specifically denied that Hall was a violent or aggressive person. Instead, Hancock's testimony described two specific instances of conduct. Under OEC 405(1), that type of evidence could have been elicited only on cross-examination.

## C. *Exclusion of Evidence Pertaining to Insanity Defense*

**25.** Defendant contends that the trial court erred in limiting the testimony of defense witness Jurdem, a public defender who had represented defendant in various proceedings in Colorado, and in excluding two letters from Colorado physicians to Jurdem. In the guilt phase of the trial, defendant asserted an insanity defense, "based in part on prior Colorado court adjudications that he was legally insane." The state had introduced evidence from several Colorado State Hospital physicians that defendant had faked mental illness during his examinations in Colorado and that he was, in fact, sane. In response, defendant wished to call Jurdem, who would have testified to an alleged bias on the part of two of the doctors, Doyle and Hufaker, who had diagnosed defendant as a malingerer. Through Jurdem, defendant also wished to introduce letters to Jurdem from two other Colorado physicians in which those physicians alleged the existence of a pattern of institutional bias in the Colorado State Hospital that predisposed its doctors to misdiagnose its mentally ill patients as malingerers. Those letters did not address defendant's particular case.

The state objected on relevance grounds, arguing that it did not intend to call either Doyle or Hufaker and that none of the witnesses whom it did intend to call would rely on any of Doyle's or Hufaker's statements or reports. The trial court agreed with the prosecution that the evidence was not relevant; the court ruled that Jurdem could testify only about his opinion of the doctors who were called to testify. However, the court stated that it would reconsider the matter if the evidence became relevant at some future point in the trial.

Analyzing the matter on a statutory level, we agree with the state that defendant's proffered evidence of bias of a nonwitness was not relevant. Evidence is relevant if it has any tendency to prove a fact at issue in the dispute. OEC 401. Defendant has not shown how Jurdem's opinion concerning the credibility of the two Colorado doctors who had diagnosed defendant as malingering would have had any tendency to affect the jury's assessment of the credibility of the witnesses who testified for the state in its case-in-chief. Moreover, the

trial court gave defendant an opportunity to establish relevance by showing that the state's mental health experts had relied on those doctors' conclusions in forming their own opinions, but defendant never established that necessary link. The trial court did not err in limiting Jurdem's testimony.

In this court, defendant makes a supplementary, constitutional argument, asserting that evidence of bias always is relevant and that the trial court's exclusion of the evidence violated his rights under the compulsory process and the confrontation clauses of the Sixth Amendment to the United States Constitution. Defendant did not raise those constitutional arguments before or during trial, nor is any error of law of that kind apparent on the face of the record. We decline to consider the constitutional objections for the first time on review. ORAP 5.45(2); *see also State v. Langley*, 314 Or 247, 253, 839 P2d 692 (1992) (declining to consider constitutional arguments not raised in trial court).

We further hold that the trial court did not err in excluding the letters to Jurdem regarding an alleged pattern of institutional bias in the Colorado State Hospital. Those letters were offered to prove the truth of their contents. The authors were not called to testify and the state had no ability to cross-examine them. Accordingly, the letters properly were excluded as hearsay under OEC 801(3).[17] Moreover, the letters did not address defendant's particular circumstances and, therefore, were not sufficiently connected to the circumstances of the defendant to be relevant.

## D. *Admission of Decedent Hall's Last Words*

Defendant contends that the trial court erred in admitting statements made by the murder victim, Hall, after he had been shot. Calderon, who had witnessed the gunfight, testified that she ran to Hall after he had been shot and that, before dying, Hall had said, "I don't want to die. * * * I love my kids. I love my family, and I really love my wife. I don't want to die." Defense counsel objected to that testimony on

---

[17] OEC 801(3) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

hearsay grounds, to which the prosecution responded that the statement was a dying declaration admissible under OEC 804(3)(b).[18] The trial court overruled the objection.

Later, defense counsel clarified his objection, claiming that the statement did not meet the dying declaration exception to the hearsay rule, because Hall's statements did not concern the causes or circumstances of his impending death. Both the trial court and the prosecutor then asserted that the statement met the hearsay exception for an "excited utterance" under OEC 803(2).[19] The prosecutor also contended that the statement was not hearsay because it was not offered to prove the truth of the matter asserted. OEC 801(3). Rather, the prosecutor argued, the statement tended to establish Hall's state of mind and thereby rebut defendant's assertion that Hall was the aggressor in the gunfight. The trial court overruled defendant's objection a second time, without specifically stating the basis for its ruling.

In this court, defendant repeats his contention that the trial court erred in admitting Hall's dying statement because it was not within any recognized exception to the hearsay rule. The statement, however, was not hearsay as defined in OEC 801(3). The statement was made outside of court, but the "matter asserted" in the statement, Hall's feelings about not wanting to die, and his love for his family, was not at issue in the case. As the prosecutor contended before the trial court, the statement was offered for a purpose other than establishing the truth of its contents, such as establishing Hall's character as a peaceable family man.

Defendant argues, alternatively, that the statement was inadmissible because it was not relevant, OEC 402, its probative value was outweighed by its prejudicial effect, OEC 403, and its admission violated various of defendant's constitutional rights. Defendant, however, did not make any of

---

[18] OEC 804(3)(b) provides that the following is admissible when the declarant is unavailable:

"A statement made by a declarant while believing that death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death."

[19] OEC 803(2) provides that the following hearsay statement is admissible, even if the declarant is available as a witness: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

those arguments to the trial court and may not do so for the first time here. ORAP 5.45(2). An objection to the admission of evidence on one ground does not preserve an objection on other grounds. *State v. Isom*, 313 Or 391, 406, 837 P2d 491 (1992).

■ Defendant concedes that he did not preserve his claims under OEC 402 or OEC 403, but asserts that this court should review the claims nonetheless as plain error. As we already have had occasion to observe, error is "plain" only when "the legal point is obvious, not reasonably in dispute." *Brown*, 310 Or at 355. In this case, the error, if any, does not rise to that level.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. This court has stated that OEC 401 is a minimal requirement for the admission of evidence; evidence is relevant even if it only slightly increases or decreases the probability that a material fact exists. *State v. Barone*, 328 Or 68, 86, 969 P2d 1013 (1998) *cert den* 528 US 1135, 120 S Ct 977, 145 L Ed 2d 928 (2000). Under that low standard, we cannot say that Hall's dying statement was irrelevant to his character for peaceableness, which defendant's self-defense theory placed at issue. It may be that the statement's minimal probative value was outweighed substantially by its unfair prejudicial effect. As this court stated in *Barone*, "generally, evidence is unfairly prejudicial under OEC 403 if it appeals to the preferences of the trier of fact for reasons that are unrelated to the power of the evidence to establish a material fact." 328 Or at 87. Certainly, Hall's dying statement was inflammatory, inasmuch as at least one of its effects likely would have been to appeal to the jury's sympathies for Hall, the victim. Nonetheless, we do not view the matter as so obvious that it is not reasonably open to dispute. Accordingly, we hold that the error, if any, was not one that is apparent on the face of the record.

E. *Admission of Documents*

■ Defendant assigns error to the trial court's decision to admit various documents offered by the prosecution: a list of books and pamphlets on weapons, combat tactics, terrorist

activities, and false identification that defendant wanted to purchase; an order of post-prison supervision, which defendant was carrying when he was arrested, forbidding defendant from carrying weapons; and a letter that defendant had written to prison officials in early 1992, explaining why he should be eligible for good-time and work release, together with the letter defendant had received from prison staff in response, stating that the reason for his ineligibility was his failure to complete a drug and alcohol treatment program. At trial, defendant objected to the admission of those documents on the grounds that they were irrelevant, cumulative, and unfairly prejudicial. The trial court overruled those objections on all three grounds.

Before this court, defendant repeats those arguments and asserts other, unpreserved, reasons why the exhibits should have been excluded.[20] It is not necessary to discuss at length whether any of those arguments is meritorious because, in each instance, we conclude that defendant has failed to establish that the error, if any, was prejudicial. As noted above, evidential error is not presumed to be prejudicial; in order to prevail, a defendant must establish that the error was not harmless. OEC 103(1). Error is harmless if there is little likelihood that it affected the verdict. In the present case, the jury had heard evidence of defendant's extensive criminal background, including his 17 convictions for violent felonies, such as armed robbery and escape. Because the jury already had heard that evidence, it was highly unlikely to have convicted defendant of aggravated murder on the basis of his possession of a list of books on weapons or a post-prison supervision order stating that he was not to carry weapons. Moreover, the jury was made aware of defendant's chemical dependency during the course of the trial. Indeed, defendant claimed in his defense that his

---

[20] In the context of his discussion of the admissibility of the list of books and pamphlets, defendant argues at length that the recently added subsection (4) of section 404 of the Oregon Evidence Code does not apply either to review in this case as a whole or to that issue in particular. OEC 404(4) expands the admissibility of certain other-crimes evidence in criminal cases. However, because we hold that the admission of the challenged documentary evidence, even if found to be erroneous, would constitute harmless error, we need not address the potential applicability of OEC 404(4).

.17 percent blood-alcohol level at the time of the crimes mitigated his culpability, and his medical experts testified that his drug and alcohol abuse was a mechanism to self-medicate his paranoid-schizophrenia. Under those circumstances, we cannot say that the jury was likely to have convicted defendant on the basis of a letter disclosing that defendant failed to complete a substance abuse program. Consequently, we reject defendant's arguments.

## VII. IMPROPER PROSECUTORIAL CONDUCT

Defendant argues that the trial court erred in failing to declare a mistrial after one of his expert witnesses, Dr. Plazak, informed the court that the prosecutor was communicating with a juror about Plazak's testimony. Plazak, a psychiatrist, testified in support of defendant's insanity defense. In an *in camera* session after he had concluded his testimony, Plazak testified that, during his testimony, one of the prosecutors had been making gestures indicating disbelief, such as head-shaking, scoffing, and laughing, toward one of the jurors in the first row. Plazak complained that, toward the end, the prosecutor's actions became so intense as to be seriously distracting. Defendant moved for a mistrial, arguing that Plazak's testimony was critical to his insanity defense and the prosecutor's actions improperly could have tainted Plazak's credibility. Alternatively, defendant asked the court to direct the prosecutor to stop his actions and to give a curative instruction to the jury to disregard any of the prosecutor's facial expressions and gestures.

The trial court denied the motion. The court had not seen the prosecutor gesticulating. Moreover, the court stated that, in its experience, lawyers who behave disrespectfully or in an inappropriate or obnoxious manner in the courtroom do more harm to their own cases than to those of their opponents. In response, defendant asked to be allowed to question the juror to whom the prosecutor's gestures appeared to have been directed. The trial court declined to interrupt the proceedings for that purpose, reasoning that it would tend to overemphasize the matter, particularly if the juror had not seen the prosecutor's gestures or if the juror had not been influenced by them.

In this court, defendant argues that, in gesturing to a juror, the prosecutor improperly vouched for the state's case by commenting on and impugning Plazak's credibility. Further, he contends that the prosecutor, by his conduct, violated defendant's due process rights under the United States Constitution and his right to a fair trial under Article I, sections 11 and 20, of the Oregon Constitution. For those reasons, according to defendant, the trial court abused its discretion in failing to declare a mistrial.

 At the outset, we note that defendant did not raise either of the constitutional objections at trial. We will not consider them for the first time on appeal. We review the trial court's decision not to declare a mistrial for abuse of discretion. *State v. Smith*, 310 Or 1, 24, 791 P2d 836 (1990). We use that standard because the trial judge is "in the best position to assess and to rectify the potential prejudice to the defendant." *State v. Farrar*, 309 Or 132, 164, 786 P2d 161 (1990). As this court stated in *Smith*:

> "The question thus is not whether this court would have granted a new trial to defendant, but whether the trial court abused its discretion in refusing to do so. Even if we find the prosecutor's remarks to be improper, tasteless, or inappropriate, we will not find an abuse of discretion in the trial court's denial of the motion for a mistrial unless the effect of the prosecutor's remarks is to deny a defendant a fair trial."

310 Or at 24; *see also State v. Simonsen*, 329 Or 288, 300, 986 P2d 566 (1999), *cert den* 528 US 1090, 120 S Ct 822, 145 L Ed 2d 692 (2000) (approving principle). We hold that the same standard applies to the prosecutor's alleged nonverbal conduct.

 In this case, we note that the trial judge did not observe the prosecutor's alleged inappropriate gesturing personally. The trial judge determined, however, that, in the overall context of the trial, it would be more prejudicial to defendant to call any additional attention to the conduct than simply to let it pass.

Because the trial court clearly was in the best position to consider the effect of the prosecutor's alleged gesticulations on all of the participants, that court's perception of the

comparative effects of that conduct and any remedy that the court might have fashioned is entitled to deference, even though that court did not observe that conduct. The trial court's comments on the matter satisfy us that that court adequately considered the potential for prejudice to the defendant and took steps to minimize the prejudice. Assuming the prosecutor's conduct to have been as improper as Plazak asserted, that conduct was not so prejudicial that the trial court's decision not to grant a mistrial or to question the allegedly affected juror can be said to have denied defendant a fair trial. We find no abuse of discretion and, therefore, no error.

## VIII. JURY INSTRUCTIONS CONCERNING THE DURESS DEFENSE

Defendant argues that the trial court erroneously instructed the jury on the applicability of the defense of duress to the first two counts of aggravated murder based on the underlying felonies of robbery and attempted kidnaping. As noted, we have reversed the convictions on those two counts because the jury instructions failed to ensure jury unanimity as to the circumstances of the underlying felonies. Accordingly, we do not consider the assignments of error pertaining to the trial court's jury instructions on the defense of duress.

## IX. SUFFICIENCY OF THE EVIDENCE TO SUPPORT CONVICTIONS

Defendant argues that there was insufficient evidence to support his convictions on counts 1, 2, 3, 5, 6, and 8, and, therefore, that the trial court erred in denying his motions for judgment of acquittal on those counts. In his brief to this court, defendant specifically addressed the sufficiency of the evidence with respect to count 1. With respect to counts 2, 3, and 5, defendant incorporates by reference the arguments he made to the trial court. Defendant does not mention or incorporate by reference any argument with respect to counts 6 and 8.

As discussed, we have reversed defendant's convictions on counts 1 and 2; there is no need to consider defendant's sufficiency-of-the-evidence arguments with regard to

those counts. We have reviewed the sufficiency of the evidence on counts 5, 6, and 8. We conclude that there was sufficient evidence to support the convictions on those counts and that further discussion is not warranted. We turn to defendant's arguments with respect to count 3.

■ This court reviews a challenge to the sufficiency of the evidence solely to determine whether a rational factfinder, viewing the evidence in the light most favorable to the state, and accepting all reasonable inferences and credibility choices, could find the elements of the crime beyond a reasonable doubt. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994). The issue is not whether this court would have found defendant guilty beyond a reasonable doubt, but whether the evidence is sufficient for the jury to so find. *Id.*

■ Count 3 alleged that defendant killed Hall in an effort to conceal his identity as the perpetrator of the crime of attempted murder. With respect to that count, defendant argued to the trial court that, because he committed the attempted murder in broad daylight in front of numerous witnesses, the jury reasonably could not have inferred that he had murdered Hall in an effort to conceal his identity as the perpetrator of that crime.

The state responded that there was no evidence that any of the witnesses knew defendant's identity, and there was evidence that defendant was attempting to flee the scene of the attempted murder when he shot and killed Hall. From that, the state argued, the jury reasonably could infer that defendant was attempting to avoid capture and thereby attempting to conceal his identity when he killed Hall. We agree that the jury was entitled to draw the inference that the state described. Accordingly, we find sufficient evidence to support the conviction on count 3.

## X. REMAINING ASSIGNMENTS OF ERROR

As noted, defendant makes several additional assignments of error. We have considered all of them and every argument made in support thereof. Any assignment of error or argument not discussed in this opinion either has been discussed by this court in previous cases and resolved against defendant, was not preserved on appeal, or is not well

taken. Further discussion of the issues would not benefit the bench or bar. Accordingly, we hold that no error occurred as claimed in any of the remaining assignments of error.

The judgments of conviction for aggravated murder on counts 1 and 2 are reversed. The judgment of conviction for aggravated murder on count 3 and the sentence of death are affirmed. The case is remanded to the circuit court for further proceedings with respect to counts 1 and 2.