GARRETT, J., dissenting.
I agree that the trial court erred for the reasons stated in the majority opinion. However, I conclude that that error was harmless because defendant has not shown that the trial court's ruling was more than a little likely to affect the verdict. Because the majority concludes otherwise, I respectfully dissent.
We may reverse a criminal conviction because of evidentiary error only if we are able to determine that the error was not harmless. Or. Const., Art. VII (Amended), § 3 ("If the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial[.]");
*1135 State v. McAnulty , 356 Or. 432, 460, 338 P.3d 653 (2014) ; State v. Davis , 336 Or. 19, 28, 77 P.3d 1111 (2003). Evidentiary error is not presumed to be prejudicial. OEC 103(1). The burden of demonstrating that an error was not harmless lies with the defendant. State v. Lotches , 331 Or. 455, 487, 17 P.3d 1045 (2000) ("A defendant in a criminal case assigning error to the exclusion * * * of evidence must establish that the error was not harmless.").
In this case, defendant challenges the trial court's ruling excluding certain testimony that Dr. Johnson would have offered. To be entitled to a new trial, defendant must show that there was more than a little likelihood that the error affected the jury's verdict. Davis , 336 Or. at 32, 77 P.3d 1111 ; Lotches , 331 Or. at 487, 17 P.3d 1045. Resolution of that issue turns on the nature of the testimony that was kept out, considered in the light of testimony that Johnson was allowed to give, as well as all of the other evidence at trial. That evaluation, in turn, rests on defendant's offer of proof. And therein lies the problem: Defendant's offer of proof is simply insufficient to permit any inference that the excluded testimony, if admitted, would have made a difference.
**604 Defendant's theory was that Detective Massey's interview of JN was flawed because he asked leading and emotionally coercive questions, and that the CARES interview of GP was flawed because the interviewer failed to explore "secondary gain"-that is, possible reasons that GP might be "acting in a way * * * to achieve some other end"; according to defendant, the interviewer should have asked GP questions about his being upset with defendant for restricting access to defendant's daughter, with whom GP was having an intimate relationship. In support of defendant's theory, defendant cross-examined the detective and the CARES interviewer on those topics. Then, Johnson testified generally about the problems that leading and emotionally coercive questions pose for the reliability of interviews, including by offering hypothetical examples of problematic questions and statements. He further explained what "secondary gain" is and the importance of exploring it in interviews.
Our only source of understanding what additional testimony Johnson would have given but for the trial court's ruling is defendant's offer of proof, which defendant presented after cross-examining the detective and the CARES interviewer. The offer of proof identifies two discrete topics about which Johnson would have testified:
"What's already pretty much established . The absence of exploration of alternative theories or secondary gain in the interview of [GP] relative to [JN].
"The fact that the methodology used by [the detective in his interview of JN] involved not only leading questions, but suggestive questions, and to some degree, what an emotionally coercive question is."
(Emphasis added.) Importantly, however, defendant-undoubtedly aware of the vouching issue-made broader representations about what Johnson would not say:
"He will not be offering testimony on any bottom lines . He will not be opining on the credibility of any witness or any victim or the defendant. He will not be talking about the results of any psychosexual evaluation."
**605 (Emphasis added.) On review, defendant reiterates that Johnson "in no way" would have commented on the statements of JN and GP.
Thus, we can discern from defendant's offer of proof that Johnson, after testifying about the importance of exploring secondary gain, would have testified that the CARES interviewer failed to do that, and, after testifying about the importance of not asking leading and emotionally coercive questions, would have testified that the detective did that. But Johnson would have avoided offering any "bottom line" conclusions about the impact on either victim's credibility. In short, the offer of proof permits the inference that Johnson would have done just two specific things: point out that the CARES interviewer did not explore secondary gain and highlight discrete parts of the detective's interview in which the detective asked questions and made statements that could be considered leading or emotionally coercive.
But the jury heard that evidence in other ways. With respect to the CARES interview of GP, defendant presented evidence in the form of medical records kept by GP's primary care provider indicating that GP had *1136 disclosed abuse to GP's primary care provider more than a week before the CARES interview, and that the primary care provider's notes indicated that GP could have had a motive to try to achieve "some other end":
"Now [GP] is upset at [defendant] because he is restricting access to his daughter, [A], after discovering [A] and [GP] had been intimate beyond what is allowed under family rules."
On cross-examination, the CARES interviewer admitted that she had not reviewed the primary care provider's notes before evaluating GP and that the above-quoted entry was not something of which she was aware when she interviewed GP. The CARES interviewer then acknowledged that she had not asked GP whether he was angry that defendant was interfering with his relationship with defendant's daughter. Thus, in substance, the CARES interviewer admitted that she had not explored that theory of secondary gain.
That evidence is not qualitatively different than what Johnson would have said about the CARES interview, **606 at least as far as we can tell from the narrow offer of proof. See State v. Bement , 363 Or. 760, 779, 429 P.3d 715 (2018) ("[E]ven when evidence relates to a central factual issue, its exclusion may be harmless if it is 'merely cumulative of,' instead of 'qualitatively different than,' evidence presented to the factfinder." (Quoting Davis , 336 Or. at 34, 77 P.3d 1111.)). Moreover, the state did not attempt to refute, either in redirect of the CARES interviewer or in closing argument, that GP's documented animus for defendant's dating restrictions would be the kind of secondary gain that should be explored in an interview.[1]
With respect to the detective's interview of JN, during cross-examination, the detective acknowledged the differences among open-ended, leading, and emotionally coercive questions, and agreed that it is important to ask open-ended questions so that the answer is not influenced or "contaminated." After doing so, the detective acknowledged, among other things, that he told JN that coming forward could stop defendant from harming other kids, and that that statement "may" have put "a lot of pressure and responsibility onto an 18- or 19-year old." The detective further conceded that, "[d]epending on the circumstances," such pressure can "influence people." A videotape of the detective's interview of JN was played for the jury.
In light of the concessions that defendant elicited from the detective on cross-examination, it is not clear what the excluded testimony from Johnson would have added except for a kind of confirmation that the detective's interview had those features that the detective had already described in his own testimony. And, although the detective did not expressly admit that some other questions were "leading" questions, defendant had everything he needed to point out during his closing argument which questions and statements were leading or suggestive by Johnson's standards:
"Detective Massey applied a lot of pressure in this case. And he certainly put a lot of pressure on [JN]. * * * Right at the start of the conversation, * * * Detective Massey says to **607 [JN], 'We really need your help. We need to hold this guy accountable.'
"* * * And when you watch that [in the interview], say to yourself, '* * * Why is he starting out with a cheerleading alliance reference? An appeal to emotionality and double appeal to emotionality, why is he doing that if we're involved in a process that seeks facts and seeks the truth?'
"* * * * *
"Why does Detective Massey start out * * * 'We need to hold this guy accountable for his behavior.' Just look at that statement, and think of how emotionally laden it is. It creates a sense of responsibility for [JN], on multiple levels.
"And then depending on what [JN's] predisposition social alliances [with the other victims and parties involved], issues with secondary gain may be. Think about how that emotionally coercive alliance approach can contaminate the production of evidence."
The state made no attempt at trial to argue that the detective's interview did not *1137 include questions and statements that were leading, suggestive, and emotionally coercive. Nevertheless, the majority points to the detective's testimony that he believed that his use of certain questioning techniques in the JN interview was justified under the circumstances. The majority relies on that testimony to suggest that the exclusion of Johnson's additional testimony was prejudicial.
But that suggestion ignores the limited understanding of the excluded evidence that we can gain from defendant's narrow offer of proof, which does not allow an inference that Johnson would have contested the detective's assertion that, under the circumstances, his technique was justified. If anything, the offer of proof suggests the contrary, as it indicates that Johnson would have simply observed "[w]hat's already pretty much established"-that is, that the detective's interview had certain features-and that Johnson would have avoided any bottom line conclusions flowing from that observation.
On review, defendant himself has done little to develop an argument that the error was not harmless, other **608 than to point out that counsel's arguments are not evidence and that the jury might have been more likely to reach defendant's desired conclusions if there was evidence from an expert expressly drawing the same conclusions. To be sure, counsel's arguments are not evidence, and evidence perceived by lay jurors to be scientific in nature can tend to be more persuasive than other evidence. See State v. Henley , 363 Or. 284, 307, 422 P.3d 217 (2018). Here, however, the conclusions that defendant asked the jury to draw-that certain questions could be considered "leading," "suggestive," or "coercive" under the standards articulated by Johnson-were not especially scientific or complicated. From Johnson's clear explanations and hypotheticals, as well as the detective's own concessions on cross-examination, the jury could readily determine that the detective had asked potentially leading, suggestive, and coercive questions.[2] There is little reason to think that additional testimony from Johnson-stating what, by that point, was plain and uncontested-would have caused the jury to reach a different verdict.
If, as the majority concludes, it is not harmless error for a trial court to preclude an expert from offering testimony that is as limited and unessential as this, it is difficult to imagine when an error in excluding testimony from any witness-either expert or lay-would ever be harmless. Cf., e.g. , State v. Klein , 352 Or. 302, 314-15, 283 P.3d 350 (2012) (even where erroneously excluded testimony did not demonstrate "exactly the same thing" as properly admitted testimony and "would have provided a different perspective and a different emphasis than" the properly admitted testimony, the error was harmless "because the jury heard the same facts" through properly admitted evidence). I respectfully dissent.
Balmer, J., joins this dissenting opinion.

The detective testified that he also was unaware of the primary care provider's report until defendant's trial, admitting that that was an "egregious oversight" on his part.

Those conclusions were, ultimately, small components of defendant's larger theory that the state's investigation, in its entirety , was deficient. Therefore, the excluded evidence's relation to a central factual issue in the case was somewhat attenuated. Cf. Bement , 363 Or. at 779, 429 P.3d 715 (evidentiary error more likely to affect a verdict if the error relates to a central factual issue).